No. 84-347

IN THE SUPREME COURT OF THE STATE OF MONTANA

1985

---

FARMERS INSURANCE EXCHANGE, a reciprocal
of interinsurance exchange,

        Plaintiff and Respondent,

-vs-

REDMOND JANZER; LUCILLE JANZER FITZWATER,
JEFFREY JANZER, PHILLIP CLUTTS, et al.

        Defendants and Appellants.

---

APPEAL FROM:  District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable Joel G. Roth, Judge presiding.


COUNSEL OF RECORD:

    For Appellant:

        Dzivi, Conklin & Nybo, Great Falls, Montana


    For Respondent:

        Smith, Baillie & Walsh, Great Falls, Montana

---

Submitted on Briefs: Jan. 31, 1985

Decided: March 20, 1985


Filed:

*Ethel M. Harrison*

---

Clerk

Mr. Justice John C. Harrison delivered the Opinion of the Court.

Appellants, Phillip Clutts and All Nation Insurance Company appeal from a summary judgment entered by the District Court of the Eighth Judicial District of the State of Montana, in and for the County of Cascade, ruling that no material fact was in dispute and that Jeffrey Janzer was not entitled to insurance coverage under his parents' automobile policy.

Farmers Insurance Exchange (hereinafter referred to as Farmers) insured a 1965 Dodge Dart automobile owned by Redmond Janzer. Redmond Janzer and his wife, Lucille Janzer resided with their fourteen year old son, Jeffrey in Cascade County, Montana at the time of the accident.

On March 8, 1978, Jeffrey Janzer, Phillip Clutts and Warner Dalton decided to run away from home in the Janzers' Dodge Dart. No express permission to use the Dodge Dart to run away was given to Jeffrey Janzer by his parents. While Jeffrey was driving, the vehicle left the highway and struck an abutment in the vicinity of Spanish Fork, Utah. Phillip Clutts, a passenger in the Janzer vehicle, was seriously injured.

Farmers Insurance Exchange filed the present action under the Uniform Declaratory Judgments Act seeking a declaration that defendant Jeffrey Janzer was not entitled to liability insurance coverage under his parents' automobile policy for any liability he may have incurred in the accident occurring March 8, 1978.

A hearing on plaintiff's motion for summary judgment was held. The District Court considered the following documents of record, including: the plaintiff's motion for

summary judgment, the oral arguments of counsel, the briefs in support and opposition thereto, the pleadings, the defendant's answers to plaintiff's written interrogatories and the depositions of Redmond Janzer, Jeffrey Janzer and Phillip Clutts. The District Court granted the motion for summary judgment ruling Jeffrey had neither express nor implied permission to use the car when he went to Utah. Further, the District Court ruled that Jeffrey Janzer was not entitled to insurance coverage under his parents' policy, nor was Farmers under a duty to defend against any claim arising against Jeffrey Janzer, Redmond Janzer or Lucille Janzer.

The following issues are raised on appeal:

(1) Whether there is a genuine issue as to any material fact which would preclude summary judgment.

(2) Whether the District Court erred in granting summary judgment that there was no liability insurance coverage for the insured's minor son under the parents' policy.

(3) Whether the District Court erred in determining that Farmers Insurance Exchange had no duty to defend under the policy.

Appellants argue the District Court erred in granting Farmers' motion for summary judgment because there existed genuine issues of material fact, namely, whether Jeffrey Janzer had the implied permission of either of his parents to use the vehicle at the time of the accident.

Respondent contends the summary judgment was proper. Respondent further contends the facts before the District Court were clear and undisputed that there was no express or implied permission to use the vehicle at the time of the accident.

Rule 56(c), M.R.Civ.P., provides that summary judgment is proper if: ". . . the pleadings, depositions, answers to interrogatories, and admisssions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

This Court has on many occasions commented upon the nature of the burden of proof imposed on the moving party under Rule 56. This Court has consistently held that the party moving for summary judgment has the burden of showing the complete absence of any genuine issue as to all facts which are deemed material in light of those substantive principles which entitled him to a judgment as a matter of law. Bonawitz v. Bourke (1977), 173 Mont. 179, 567 P.2d 32; Harland v. Anderson (1976), 169 Mont. 447, 548 P.2d 613. The rule imposes a strict standard upon the movant and in Kober and Kyriss v. Stewart & Billings Deaconess Hosp. (1966), 148 Mont. 117, 417 P.2d 476, this Court quoting from 6 Moore's Federal Practice 2nd §56.15[3], held: " . . . to satisfy his burden the movant must make a showing that is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact."

The initial burden of proof must attach to the movant, however, that burden shifts where the record discloses no genuine issue of material fact. Harland v. Anderson, supra. The party opposing the motion must come forward with substantial evidence raising the issue. Rickard v. Pardis (1975), 167 Mont. 450, 539 P.2d 718; Roope v. The Anaconda Company (1972), 159 Mont. 28, 494 P.2d 922; Flansberg v. Montana Power Company (1969), 154 Mont. 53, 460 P.2d 263.

4

The testimony presented must be reviewed in a light most favorable to the party opposing the summary judgment. The right of the opposing party to present the merits of his case to the fact finder must be preserved. Mally v. Asanovich (1967), 149 Mont. 99, 423 P.2d 294; Johnson v. St. Patrick's Hosp. (1967), 148 Mont. 125, 417 P.2d 469. In reviewing Farmers' motion for summary judgment, the foregoing rules and principles will control.

Jeffrey Janzer testified by deposition to the conditions under which he was allowed to use the Dodge Dart:

"Q And can you tell me who taught you to drive?

"A My father did.

"Q Can you give me some idea as to when that learning process started?

"A About three years before the accident.

". . .

"Q And did you drive the car when your father was present during those three years?

"A Yes.

"Q Can you tell me what kind of places -- where you drove it?

"A I drove it when my father was present on the highway. There is a time, I believe when I was 13, we had a 110-acre farm out at Fairfield, and I drove quite often by myself out there during irrigating.

"Q Did you drive on the county roads out there?

"A No; that was just on the farm itself.

"Q And when you lived in Utah, did you live on a farm?

"A No, it was just another five-acre place like this one.

5

"Q   On the outskirts of some town?

"A   Yes.

"Q   Did you drive in Utah?

"A   Yes, I did.

"Q   What kind of places there?

"A   Mainly with my parents on the highway.

" . . .

"Q   . . . after your parents came back in the fall, up until the time of this accident, would you say that you regularly drove the car when your parents were present?   When you took a trip or something?

"A   When I took a trip, yes, it was pretty common occurrence.

"Q   Now, when you say take a trip, you mean you drove on the highway?

"A   Right.

"Q   How about driving to and from town? Did you regularly drive when your folks and you were coming to and from town to Manchester?

"A   That was the time period that I learned city driving, right there.   So I was driving fairly regularly then too. If my parents didn't have anything important to do in town.

"Q   So if the family was coming to town or you were coming along, you generally drove?

"A   Yes.

"Q   And would you say that most of the time?

"A   No, not most of the time; maybe 50 percent of the time.

"Q   Now, did your mother know that your father taught you to drive as early as he did?

"A   Yes.

"Q   How many vehicles of various kinds did your folks own?

6

"A    They owned?

"Q    I'm talking about March of '78.

"A    They owned a Dodge Club Cab pickup, 4-wheel drive; a Thunderbird, '77 Thunderbird; and that '65 Dodge Dart.

". . .

"Q    Did you drive all those cars?

"A    Yes.

"Q    Can you tell me any times before March of '78 that you were allowed to drive the car without your parents present?

"A    I worked about a mile at a family's house -- was kind of a hand.  It was about a mile away from our place.

"Q    Out at Manchester?

"A    Yes.    I drove to and from there.

"Q    And your parents knew that?

"A    Yes.

"Q    You did that alone?

"A    Right.

"Q    Now, was that on a county road or the highway?

"A    County road.

"Q    How often?  Was this from the fall when you started school and finished out at your uncle's place?

"A    It was from late December till --

"Q    Up to the time of the accident and past, probably?

"A    Right.

"Q    How often during the week would you make that trip?

"A    Every day.

"Q    And when you worked up at your uncle's farm that prior summer, that would be the summer of '77?

"A    Right.

"Q    Did you drive without an adult present in those vehicles?

"A    Yes.

"Q    Did you drive any of those vehicles on the highway alone?

"A    No.

"Q    Just county roads?

"A    Right.

"Q    I take it that you drove them with the knowledge and permission of your uncle?

"A    Yes.

"Q    And did they know that you were driving them without anybody being present?

"A    Yes.

"Q    Did you ever have a limited driver's license from the State of Montana-

"A    No.

"  .  .  .

"Q    When you took these trips back and forth to this job, to the neighbor's house, out at Manchester, what vehicle did you usually drive?

"A    The Dart.

"Q    The Dodge Dart?

"A    Yes.

"Q    When you took the Dart on those trips back and forth to your job, did you ask your mother or your father for permission to drive the car each time?

"A    Not each time, no. They knew I was doing it.

"Q    They generally gave you permission to do that?

"A    Yes.

"Q    Where were the keys to the Dodge Dart generally kept?

8

"A    Upstairs in the kitchen.

"Q    Whereabouts in the kitchen?

"A    On the counter.

"Q    Was there a set place for them?

"A    No; there was no set place.

"Q    They were usually in the kitchen?

"A    Yes.

"Q    What about keys for other vehicles? Were they kept in the same place, generally?

"A    No.  My mother usually carried them or Dad carried them, depending on who was driving the car."

Redmond Janzer, Jeffrey's father, testified that Jeffrey's testimony was essentially accurate.  However, Redmond Janzer did testify that whenever he was around, Jeffrey was required to ask for permission each time he wished to use the Dodge Dart and that he did not ask for such permission on the day of the accident.  Phillip Clutts testified that he saw Jeffrey Janzer on two occasions with the Dodge Dart at school.  Once, he saw Jeffrey Janzer drive the vehicle.  Phillip Clutts also testified that Jeffrey Janzer had told him that the Dodge Dart was his car to use any time he wanted to use it.

Even though the testimony of the witnesses revealed no express permission to run away from home and use the Dodge Dart in the process, implied consent remains a genuine issue of material fact.

Viewing the facts in a manner most favorable to the defendant, the following facts suggest implied permission: (1) at the age of 10, Jeffrey Janzer had been taught to drive by his father; (2) his parents permitted him to drive, unsupervised, over public county roads to and from work on

9

the farm daily for an entire summer; (3) Mr. Janzer acknowledged that during the six months before the accident Jeffrey drove frequently in his presence on trips into town and on the highway; (4) the keys to the Dodge Dart were kept on the kitchen counter fully available to Jeffrey Janzer at all times, when at the same time, the keys to the other vehicles were carried by his parents. We find the inferences which might reasonably be drawn from these factors compel the conclusion that Jeffrey's permission to use the vehicle "did not stop at the corral gate," that a genuine issue of material fact, that of implied permission, remains to be resolved by a jury.

Many cases are cited and discussed in the briefs and in turn distinguished factually by counsel. A line of cases have addressed the significance of family relationships in resolving issues of implied permission. In a California Appeals Court decision, the court found that the insured's daughter was operating the automobile with implied permission at the time of the accident where the daughter knew the location of the keys to the automobile even though she had not been given permission to drive. The court stated that where parties are related by blood, or marriage, or where relationship between owner and operator is that of principal and agent, weaker evidence will support a finding of permissive use than where parties are only acquaintances or strangers. Elkinton v. California State Auto Ass'n Inc. Ins. Bur. (Calif. 1959), 343 P.2d 396. In another California decision, a finding of implied permission was sustained despite the fact that the mother had persistently forbidden her son to drive her automobile. Casey v. Fortune (Calif. 1947), 179 P.2d 99. The Wisconsin Supreme Court has also

10

recognized the significance of the parent/child relationship in finding implied permission. Derusha v. Iowa National Mutual (Wisc. 1970), 181 N.W.2d 481. Also see Eckles v. Johnson (Idaho 1974), 526 P.2d 1100, in which the court held that the relationship of father and son between the owner and the driver, reasonably supported an inference that the driver was operating the vehicle with the owner's consent.

In the present matter, a family relationship exists, that of parent and child. While more than the relationship of parent and child is required to establish permissive use, it supports this Court's finding that a genuine issue of material fact precludes the disposition of this case by summary judgment.

The foregoing facts and circumstances establish a genuine issue of material fact as to the existence of implied permission. We have long recognized that summary judgment is never to be used as a substitute for trial if a factual controversy exists. Kronen v. Richter (Mont. 1984), 683 P.2d 1315, 41 St.Rep. 1312; Reaves v. Reinbold (Mont. 1980), 615 P.2d 896, 37 St.Rep. 1500. This issue must properly be placed before a jury. It was therefore, error for the District Court to grant the defendant's motion for summary judgment.

Accordingly, because the District Court erred in granting respondent's motion for summary judgment, the District Court's ruling that there was no liability insurance coverage for the insured's minor son under the parents' policy nor a duty for respondent to defend any claim against the insured must likewise fail.

Respondent argues that the insurance policy confines the definition of insured to:

11

> "Any other person while using such automobile and any other person or organization legally responsible for its use provided the actual use of such automobile is by the named insured or with his permission."

Respondent urges because Jeffrey Janzer had neither implied nor express permission, the policy coverage does not extend to him.

Section 61-6-103, MCA, is Montana's legislative enactment for omnibus coverage. The term insured includes:

> "(2) Such owner's policy of liability insurance shall:
>
> ". . .
>
> "(b) insure the person named therein and any other person, as insured, using any such motor vehicle or motor vehicles with the express or implied permission of such named insured, against loss from the liability imposed by law for damages arising out of the ownership, maintenance, or use of such motor vehicle . . ." Section 61-6-103(2)(b), MCA.

Appellants contend that this Court has adopted a liberal interpretation of such a clause. Appellant's contention is correct. In Cascade Insurance Co. v. Glacier General Insurance Co. (1971), 156 Mont. 236, 479 P.2d 259, a case of first impression regarding the interpretation of the omnibus law, we recognized that provisions for omnibus coverage in an automobile liability insurance policy reflects legislative policy to protect the public when a motor vehicle is operated by one other than the insured owner with his consent. In National Farmers Union v. State Farm Mutual (D.Mont. 1967), 277 F.Supp. 542, the Federal District Court adopted the circuit court rule which required liberal interpretation, particularly in cases involving the use of automobiles as "family cars." State Farm Mutual Automobile Ins. Co. v. Williamson (9th Cir. 1964), 331 F.2d 517. If the jury

concludes that Jeffrey Janzer had his parent's implied permission to drive the vehicle, then the legislative policy to extend coverage to this accident should be adopted.

Recently, this Court considered a case nearly on point. In Mountain West Farm Bureau Mutual Insurance Company v. Farmers Insurance Exchange Company (Mont. 1984), 680 P.2d 330, 41 St.Rep. 829, Justice Morrison recognized a rule which Farmers argues should be applied to the case at bar.

> "A complete and unreasonable departure from the intended use, or an intentionally dangerous and wrongful operation could support a ruling that the use was outside of the scope of permitted use as a matter of law. . ." Mountain West, 41 St.Rep. at 831.

We declined to apply this rule to the facts in Mountain West. Similarly, the rule is not controlling here. Mountain West involved a question regarding the degree of permission granted. There, the insured granted permission to a high school classmate to drive on previous occasions. On the night of the accident, another friend asked the insured for the keys to the insured's car so he could listen to the radio. The insured gave the keys to him with the abonishment that they were only to listen to the radio. When a police officer approached the two, the boys drove off, running over the police officer in the process. The jury found that the defendant was using the car with the insured's implied permission. This court affirmed the lower court's ruling that Mountain West was the insurer of the defendant for the defense of the action and the payment of any damages arising out of the incident. The instant case, likewise, presents a question involving scope of "permission." In both cases the insured granted another permission to drive the vehicle on separate occasions prior to the accident. In both cases, the

13

drivers exercised the permission beyond the scope of permission granted to them. In Mountain West, the driver was explicitly instructed not to drive the car, only to listen to the radio. In the present matter, the driver was given no permission to run away from home. In fact, a question as to whether the son was required to ask for permission each time he used the vehicle is in dispute. We hold, should the jury make a finding of implied permission, the District Court must accordingly enter judgment in accordance with Mountain West, and decree respondent to be the insurer of Jeffrey Janzer and his parents for the defense of the action and payment of any damages.

The summary judgment is vacated. Because the District Court's decision was confined to the question of summary judgment, the negligent entrustment claim will not be reviewed on appeal. This cause is remanded for further proceedings consistent with the view expressed herein.

Justice

We concur:

Justices

14

Mr. Justice L. C. Gulbrandson, dissenting.

I respectfully dissent.

The facts set forth in the majority opinion would be relevant if the issue to be decided was "negligent entrustment of a vehicle." In my view, the record discloses other facts which I believe were utilized by the trial judge in granting the plaintiff's motion for summary judgment on the issue of express or implied permission to operate the insured vehicle.

Jeff testified that, prior to taking the vehicle, he got on the school bus as he normally did, that he later left the bus and walked back to the barn at the family residence where he hid for approximately four hours until both his parents had left the residence. He then entered the residence, obtained the car keys, and left with the vehicle for Utah, with the intention of not returning. Jeff further testified that he was not allowed to operate a motor vehicle without express permission of his parents and that at least one of his parents had to be with him when on the highway or in town.

Jeff's father testified that Jeff was never to take the car without asking either of the parents first, and that he could not drive a car in town or on the highway without one of the parents being with him.

Jeff's father also testified that he reported the car as "stolen" to the local sheriff's office and to the Montana Highway Patrol, even though he believed the car had been taken by his son Jeff.

It is my opinion, based on the entire record, that the trial judge correctly ruled that, as a matter of law, there was no express or implied permission given by the parents to their son Jeff to operate the insured vehicle at the time of the accident. I would affirm.

Justice

Mr. Chief Justice J. A. Turnage specially concurring:

I respectfully concur in the dissent of Mr. Justice Gulbrandson.

_J. A. Turnage_
Chief Justice

16