No. 92-317

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

KARREN KANE,

       Plaintiff and Appellant,

-v-

BILLY MILLER,

       Defendant and Respondent.

FILED

MAY 6 1993

Ed Smith

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:  District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable R. D. McPhillips, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

          Patrick F. Flaherty, Great Falls, Montana

      For Respondent:

          Joan Cook, Great Falls, Montana

Submitted on Briefs:  December 17, 1992

Decided:  May 6, 1993

Filed:

_____
        Clerk

Justice Fred J. Weber delivered the Opinion of the Court.

Appellant Karren Kane appeals the order of the District Court of the Eighth Judicial District, Cascade County, which granted defendant Billy Miller's motion for summary judgment in a legal malpractice action. We affirm.

We find the following issue dispositive:

Whether the District Court erred by granting defendant's motion for summary judgment.

Ms. Kane's legal malpractice action originated from Mr. Miller's representation in a proceeding initiated by the State to obtain permanent custody of Ms. Kane's son JEH and to terminate her parental rights. Mr. Miller replaced Ms. Kane's former public defender, Nancy Belcheff, after Ms. Belcheff resigned her position as a Cascade County public defender in early March 1987. Mr. Miller was the third attorney to represent Ms. Kane in that matter.

The events leading to the parental rights termination proceeding began in 1984 when Ms. Kane called the Department of Social and Rehabilitative Services (SRS) and requested that JEH, her eight-year-old son, be placed in residential placement because she could not control his violent behavior. The youth was removed from Ms. Kane's home and initially placed in foster care. As early as July 18, 1985, Ms. Kane stipulated to a treatment plan with SRS. At that time, she was represented by her first attorney, Mark Bauer. On July 28, 1985, JEH was transferred to the Yellowstone Boys and Girls Ranch in Billings, Montana. A psychological

2

evaluation was subsequently administered there. He has received psychological treatment since then with positive results.

The stipulated treatment plan required Ms. Kane and her daughter to obtain psychological evaluations by a licensed clinical psychologist and to follow any of the resultant recommendations. Although she agreed to follow the treatment plan, she did not comply with its provisions. Ms. Kane and her daughter had still not obtained psychological evaluations at the time of the final termination hearing nearly two years later.

In July 1986, the District Court allowed Ms. Kane additional time to comply with the treatment plan. A hearing was subsequently held on November 12, 1986, to terminate Ms. Kane's parental rights because she had still not complied with the SRS treatment plan. The court again continued the hearing so as to allow Ms. Kane yet another opportunity to comply with the treatment plan. A final hearing was rescheduled for April 2, 1987.

Mr. Miller was appointed to represent Ms. Kane shortly before the April 2, 1987 hearing. Testimony at that hearing established that Ms. Kane had failed to comply with the court ordered treatment plan after nearly two years. SRS employees testified to their opinion that no additional time should be allowed for Ms. Kane's compliance due to JEH's need for permanency and further treatment. A social worker and therapist both testified that Ms. Kane refused to comply because she felt that the problem was physical in nature and originated with the child.

3

Other evidence, in the form of eleven separate medical statements from various doctors, indicated that JEH suffered from no neurological disfunction. It also established that Ms. Kane had taken the boy to doctors since he was a baby looking for a medical explanation for continuing difficulties that she experienced with him.

Doctors repeatedly diagnosed no neurological disfunction, explaining JEH's behavior as the result of a severely disturbed mother-child relationship. Dr. Monte Kuka, a clinical psychologist, concluded in his diagnosis of JEH, that JEH was a deeply disturbed child with emotional problems that went back many years. He said the problem developed because the child felt abandoned by his mother and by several father figures and because the mother had emotional problems. Also assessing Ms. Kane in that same year, he diagnosed her as having an inconsistent parenting style, angry outbursts and blaming JEH in an attempt to humiliate him with guilt. None of the doctor's diagnoses convinced Ms. Kane that JEH's problems were emotional and not medical in nature.

In February 1987, less than three months before the final hearing in the termination of parental rights proceeding, Ms. Kane attended a foster care review meeting at SRS and insisted that JEH had Tourette's syndrome. Ms. Kane had not previously attended any of these meetings which were designed to facilitate services provided by SRS. She explained her attendance that particular day as essential, because if she did not attend the review, SRS would win and she wanted to show them that they were wrong.

4

Throughout the duration of that proceeding, Ms. Kane dealt with several social workers from SRS. In 1986 she began working with Nancy Pallares-Hernandez. Ms. Pallares-Hernandez testified that although Ms. Kane had been involved with four social workers, none of them had been able to help her. She testified that Ms. Kane resisted help because she refused to accept that she had a problem and continued to place all blame on her son's physical condition. Ms. Pallares-Hernandez testified that when she tried to reassure Ms. Kane that she did indeed want to help her and support her, suggesting that Ms. Kane go to mental health, Ms. Kane told her that "she doesn't trust the therapists and that she doesn't trust in the records; that SRS is wrong; that Judge McKittrick is the prosecutor; that all the social workers are crazy; [and] that she is the only one who is okay."

Ms. Pallares-Hernandez' efforts to help Ms. Kane included several letters which she wrote to Ms. Kane and home visits to encourage her to get the treatment that she desperately needed to improve the family's emotional environment so that JEH could be reunited with them. In a letter dated August 22, 1986, she told Ms. Kane that contacting a psychologist was at that time the only way to help her son. On October 1, 1986, she mailed another letter to Ms. Kane encouraging her to get psychological evaluations and reminding her of the upcoming hearing. In February 1987, after the November hearing was continued to give Ms. Kane additional time to comply with the treatment plan, Ms. Pallares-Hernandez wrote another letter reminding her about the importance of complying with

5

the treatment plan before the next court hearing. In that letter she wrote: "This is the only way to have your child back with you."

On March 2, 1987, she again wrote to Ms. Kane, reminding her of the need to comply with the court order, outlining JEH's visits to doctors and their diagnoses and again stating SRS' position that the problem was the mother-child relationship. In addition to Ms. Pallares-Hernandez letters, Ms. Kane's previous attorney, Nancy Belcheff, in a letter dated February 18, 1987, noted that she too had received copies of the SRS letters and stated: "If you refuse, no lawyer in the world will be able to help you."

Billy Miller began employment with the public defender's office in Cascade County in early March of 1987. He met with Ms. Kane once prior to the termination hearing. He could not locate her file at that time. Mr. Miller testified that he received the file a few days before the hearing. The only witness Mr. Miller called at the hearing to testify on Ms. Kane's behalf was her mother, who testified regarding the love between Ms. Kane and JEH.

The hearing went forward with the State calling witnesses and Mr. Miller cross-examining them. The order resulting from that hearing terminated Ms. Kane's parental rights relating to JEH.

On April 27, 1990, Ms. Kane filed a complaint alleging that Mr. Miller had committed professional negligence. In her complaint Ms. Kane alleged that Mr. Miller assured her that he would request a continuance and the continuance would be granted, as well as numerous other inadequacies relating to Mr. Miller's representation in the parental termination proceeding. The District Court granted

Mr. Miller's motion for summary judgment twelve days before the scheduled trial date of May 14, 1992.

Did the District Court err in granting defendant's motion for summary judgment?

Summary judgment is proper under Rule 56(c), M.R.Civ.P., when the movant has shown that there is no genuine issue as to any material fact, in light of the substantive legal principles entitling the movant to judgment as a matter of law. Christopherson v. White, Inc. (1991), 250 Mont. 118, 120, 817 P.2d 1165, 1167. The purpose of Rule 56, M.R.Civ.P., is to dispose of those actions which do not raise genuine issues of material fact, and to eliminate the expense and burden of unnecessary trials. Berens v. Wilson (1990), 246 Mont. 269, 271, 806 P.2d 14, 16.

"Our scope of review is the same as the trial court and is a question of law. If as a matter of law no genuine issue of material fact exists summary judgment is granted." Christopherson, 817 P.2d at 1167. Generally, negligence issues are not susceptible to summary judgment motions because of the factual issues involved in such cases. Lorash v. Epstein (1989), 236 Mont. 21, 24, 767 P.2d 1335, 1337. This case, however, does not involve factual issues germane to a negligence determination as our decision is based on an assumption that Mr. Miller may have been negligent.

In order to establish a cause of action for legal malpractice there must be a showing that the attorney owed his client a duty of care, that there was a breach of this duty by a failure to use reasonable care and skill, and that the breach was the proximate

7

cause of the client's injury and resulted in damages. Merzlak v. Purcell (1992), ___ P.2d ___, 49 St.Rep. 139, 140.

Clearly the first element was met in this case. There is no dispute that an attorney-client relationship existed between Ms. Kane and Mr. Miller. The second element requires Ms. Kane to establish that Mr. Miller's conduct constituted a failure to use reasonable care and skill; that is, that he breached his duty to his client. Here, we have assumed that Mr. Miller may have been negligent. However, such breach of duty alone is not sufficient to establish liability for professional negligence.

The third element that Ms. Kane must prove is that Mr. Miller's negligence proximately caused her injury and damages. In this case, to withstand Mr. Miller's motion for summary judgment, Ms. Kane needed to establish that "but for" Mr. Miller's negligence, the result of the hearing to terminate parental rights would have been different. Failure to prove causation and damages is fatal to an attorney malpractice action. Kinniburgh v. Garrity (1990), 244 Mont. 350, 355, 798 P.2d 102, 105. Ms. Kane must show that "but for" Mr. Miller's conduct, her parental rights would not have been terminated as a result of the April 2, 1987 hearing.

Ms. Kane presented evidence that Nancy Pallares-Hernandez, the SRS social worker, if asked, would have requested that the hearing be postponed, thus giving Ms. Kane a third chance to comply with the stipulated treatment plan. The decisive question in this case, however, is not whether Ms. Pallares-Hernandez would have agreed to a continuance and the plaintiff would then have complied with the

8

treatment plan, but whether a continuance would have made <u>any</u> <u>difference</u> in the result.

The record establishes that such evidence would not have made any difference here. The defendant submitted an affidavit by Judge Joel G. Roth, the presiding judge in the termination hearing. Judge Roth stated that he had two reasons for terminating Ms. Kane's parental rights: (1) he was unpersuaded that she would comply with the treatment even if she was given yet another chance, and (2) that further delay in the resolution of the case would not serve the best interests of the child. In his affidavit Judge Roth stated:

> Despite argument presented at the final hearing by Billy Miller, on Ms. Kane's behalf, that she had recently become involved in the parenting program at the YWCA, that they were attempting to get her into a mental health program, and that she should be given yet another chance to comply with the treatment plan, this Court was unpersuaded that Ms. Kane would actually comply.

The court gave the following reasons for its belief that Ms. Kane would not comply with its prior order: (1) that she had consistently denied that she needed treatment, (2) that she did not accept the diagnosis that the child had emotional problems, (3) she continued to seek a medical reason for the child's problems, and (4) she had a pattern of externalizing any basis for the family's disfunction.

Most importantly, Judge Roth stated that only presentation of evidence that Ms. Kane had, in fact, complied with the treatment plan would have altered his decision to terminate her parental

9

rights. Ms. Kane's failure to complete her treatment plan was established by uncontradicted evidence.

The environment provided by Yellowstone Boys and Girls Ranch has provided the structure and stability that Ms. Kane was unable to provide. Uncontested evidence indicates that Yellowstone Boys and Girls Ranch has been beneficial to JEH during his extended stay there. Since he has been living in Yellowstone Boys and Girls Ranch, JEH has again done well in school and has responded to their therapy.

The record establishes that Mr. Miller did argue that Ms. Kane should be given another chance. Although he did not file a written motion for a continuance, he stated as follows:

> . . . [C]learly, your Honor, . . . the best interest of the child is the paramount objective of this hearing, and the fact that we have established, by way of testimony, that the love between the mother and child is quite extensive, to the point that when we talk about the best interests of the child, that is one of the . . . top objectives . . . . Now, we have problems . . . . [JEH] probably will not be adopted. So it's our recommendation, Judge, that you actually permit us to find some type of program . . . for Karren to participate in and give us a certain length of time to actually comply to the court's order. Therefore, we ask for a postponement of your disposition of this case and give us an opportunity. Sure, she has had a couple in the past, but I feel that what we have here is so unique, it requires more than just two opportunities . . . . If we have that opportunity, I feel we would at least have given it our best shot in trying to establish a better home for [JEH] and trying to establish a relationship between mother and child whereby we'll be able to look back . . . and say we have done justice to both individuals, [JEH] and his mother.

Ms. Kane argues that the crucial fact question Judge Roth failed to address in his affidavit is what he would have done if Mr. Miller had asked for a continuance. We do not find this to be a question

10

of fact requiring resolution as the above excerpt from the transcript of the hearing indicates that Mr. Miller did ask for another opportunity, although he did not specifically mention the word "continuance."

Of paramount importance is the best interest of the child. Judge Roth found it was in the youth's best interest to terminate Ms. Kane's parental rights so that JEH could continue treatment in a therapeutic foster home and be placed in a permanent home when emotionally ready. Ms. Kane failed to present any evidence to prove that the best interests of the child were not served.

Ms. Kane also failed to present any facts which would establish that Mr. Miller's actions were the proximate cause of the District Court's decision to terminate her parental rights with regard to JEH. We conclude that Ms. Kane has not established that "but for" Mr. Miller's actions, the result in this case would have been different.

We hold that the District Court properly granted Mr. Miller's motion for summary judgment.

Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____
John Conway Harrison

_____
William E. Hunt

_____

_____

_____
Justices

12

Justice Terry N. Trieweiler dissenting.

I dissent from the majority opinion.

In support of its conclusion, the majority cites testimony unfavorable to the plaintiff which resulted from a hearing where she was effectively unrepresented and had no opportunity to present evidence of her own. In a peculiar form of logic, the majority then cites the conclusion drawn by the trial judge under these circumstances as conclusive proof that the result would have been the same even if plaintiff had been adequately represented. So much for traditional notions about the adversary system.

The defendant, who formerly represented the plaintiff at the hearing held to determine whether her parental rights should be terminated, took the Montana Bar Examination in February 1986, and began practicing in August of the same year. He was appointed public defender on April 1, 1987, and represented plaintiff at the hearing in question on the following day. The hearing was held on a Monday. He received the file several days earlier, and met with his client on only one occasion, on the Thursday or Friday preceding the hearing. The situation defendant found himself in was unfair to either him or his client.

Defendant admitted in his deposition that he did not have time to go through the normal procedures to prepare for a termination of parental rights proceeding. He felt the only thing necessary for him to do was appear at the hearing.

Defendant conducted no pretrial discovery; he interviewed none of the State's witnesses; he did not interview plaintiff's child;

13

and he made no effort to negotiate either a continuance or some other resolution of the underlying proceedings with the county attorney.

Defendant testified that his only preparation for the hearing at which plaintiff's parental rights were terminated was to talk to his client on one occasion and review the file.

He testified that his plan was to simply call his client as a witness and hope that through her testimony he could persuade the court to give her one more chance to comply with the treatment plan. However, not even plaintiff was called to testify at her hearing.

Defendant agreed in his deposition that he had promised plaintiff he would ask the court to continue her hearing, and contends that he did so. However, Julie Macek, who reviewed the transcript of the termination hearing and was listed as an expert on defendant's behalf, testified that defendant did not ask the court for a continuance at the outset of the hearing. Instead, he allowed the hearing to go forward and allowed the State's unchallenged case to be presented. Then, in his closing argument, he asked the court to postpone a decision until his client had one more chance to comply with the treatment program. He made no mention of the fact that he was unprepared for trial, and that a continuance, therefore, was absolutely necessary. Obviously, under these circumstances, the District Court declined to postpone its decision.

14

After the hearing, the District Court terminated plaintiff's parental rights based upon her failure to comply with the recommended treatment program. Instead of advising plaintiff of her right to file a motion for rehearing or appeal the District Court's decision, defendant did nothing. He simply waited until she came in to pick up her file and then told her that the time for filing an appeal had passed. He considered his services concluded when the District Judge made his decision to terminate plaintiff's parental rights.

When asked in his deposition whether plaintiff received ineffective assistance of counsel in the proceeding to terminate rights, he declined to answer.

In her affidavit in opposition to defendant's motion for summary judgment, plaintiff stated that in her initial interview with defendant she was told that he would be getting the hearing continued and that she would not need to prepare to testify or call witnesses. She testified that on the following Monday she attended the hearing with defendant, and to her surprise, no continuance was requested. She stated that she was not called to testify, and that other than her mother, neither were any other witnesses called on her behalf. She stated that since the hearing she has obtained a full and complete psychological evaluation which has established that she is a normal, healthy person who is fit to be a mother.

Nancy Pallares-Hernandez is a social worker employed by the Department of Family Services for the State of Montana. Plaintiff's termination of parental rights case had been assigned

to her in August 1986, and she was in charge of monitoring the treatment program at the time that plaintiff's parental rights were terminated. She had the most direct involvement in assuring that the best interests of plaintiff's son were served, and her recommendations would obviously have been important to the District Court's decision. When asked what she would have recommended if she had known prior to the April 2, 1987, hearing that plaintiff was willing to complete the treatment program by getting a psychological evaluation, and that her attorney needed a continuance of the hearing to accomplish the evaluation, she gave the following answers:

Q. Excuse me, assuming that Billy would have said to you words to this effect --

A. Um-hum.

Q. "Nancy, I visited with Karren, and we've really had a heart-to-heart talk, and we really understand what you are trying to do, and we understand how important the psychological evaluation is, we are going to get it, would you continue the hearing while we go ahead and get it," would you have then recommended a continuation of the proceedings?

A. Yes.

The majority concedes that there was an attorney-client relationship between plaintiff and defendant and generously assumes that plaintiff would have been able to establish that defendant acted negligently. In fact, two separate attorneys licensed to practice in Montana testified by deposition that defendant's representation of plaintiff was negligent.

16

However, the majority goes on to conclude that even though defendant may have been negligent, his negligence did not cause any damage to plaintiff because the District Court would not have continued her case, even if it had been requested to do so. The majority bases that conclusion on an affidavit submitted by the District Judge who decided this case. In his affidavit, he outlines the history of the case and then states that despite the argument presented at the final hearing, he was unpersuaded to postpone his decision, pending plaintiff's compliance with the treatment program. However, being unwilling to postpone a decision after listening to a one-sided hearing about plaintiff's unfitness to be a parent is not the same thing as considering a motion to continue by an attorney who was unprepared to proceed, and which would have been joined in by the case worker in charge of seeing that the child's best interest was served. In fact, in *State v. Timblin* (1992), 254 Mont. 48, 834 P.2d 927, where this same attorney moved for a continuance which was denied by the same District Judge, we reversed after concluding that the judge abused his discretion. We held that denial of the continuance in that case denied the fundamental fairness to which the defendant was constitutionally entitled. Certainly, this mother, whose right to parent her child was at stake, was entitled to no less fairness.

How can this majority disregard the District Court's decision in *Timblin*, even though a proper motion and argument for continuance had been presented in that case, and then rely on irrelevant

17

comments by the same District Judge in this case when, in fact, no proper motion had been presented and the basis for a continuance had not even been explained to the judge? Had that motion been presented and granted, and had plaintiff, in the interim, submitted to the psychological evaluation that she has now completed, it is clear that her parental rights would not have been terminated.

In reviewing a motion for summary judgment, this court must view the evidence in the light most favorable to the party opposing the motion. *Payne Realty & Housing, Inc. v. First Security Bank* (1991), 247 Mont. 374, 807 P.2d 177. The majority has done just the opposite.

Summary judgment is not a proper tool for resolving disputed issues of fact. *Flanagan v. Curran* (1974), 164 Mont. 262, 521 P.2d 200. However, that is exactly what the District Court relied on in this case; and it did so with the majority's approval.

Summary judgment should not be used as a substitute for trial when factual controversies exist. *Farmers Ins. Exchange v. Janzer* (1985), 215 Mont. 260, 697 P.2d 460. However, the majority, with increasing frequency, finds summary judgment an acceptable alternative to the inconvenience of jury trials.

A parent's rights are among the most important rights in our society. No parent should have those rights terminated without due process. Due process necessarily requires effective representation. Where those rights were terminated without effective representation, plaintiff has sustained damage beyond the imagination of most people. She should not have been denied

18

further rights in this proceeding without an opportunity to present her evidence to a jury, as was intended by Article II, § 26, of the Montana Constitution.

For these reasons, I dissent from the majority opinion. I would reverse the judgment of the District Court and remand this case for a trial by jury to resolve the factual issues which have been resolved by the majority on appeal.

_____
Justice

Justice Karla M. Gray joins in the foregoing dissent.

_____
Justice

19